**INFINITY BROADCAST CORP., Plaintiff–Appellant,**

v.

**Wayne KIRKWOOD, doing business as Media Dial–Up, Defendant–Appellee.**

**Docket No. 97–7764.**

United States Court of Appeals, Second Circuit.

Argued March 23, 1998.

Decided July 2, 1998.

Amended July 29, 1998.

---

* Honorable Milton Pollack, of the United States District Court for the Southern District of New York, sitting by designation.

Bruce B. Keller, New York City (Debevoise & Plimpton, Jeremy Feigelson, Robert J. Driscoll, of Counsel), for Plaintiff–Appellant.

Wayne Kirkwood, Dallas, TX, pro se, for Defendant–Appellee.

Before: FEINBERG and CALABRESI, Circuit Judges, and SEYBERT, District Judge.*

FEINBERG, Circuit Judge:

Plaintiff Infinity Broadcasting Corp. ("Infinity") appeals from a judgment of the United States District Court for the Southern District of New York, Lewis A. Kaplan, J., dismissing Infinity's complaint against defendant Wayne Kirkwood, doing business as Media Dial–Up ("Kirkwood" or "Dial–Up"). Infinity, which now operates as CBS Radio, is one of the largest networks of radio broadcasters in the country and is the copyrightholder of the programs broadcast on its stations. Dial–Up enables subscribers (for a fee) to listen over the telephone to contemporaneous radio broadcasts in remote cities, including broadcasts by Infinity-owned stations.

Infinity commenced this copyright infringement action in February 1996, seeking an injunction restraining Kirkwood from retransmitting copyrighted material broadcast by its stations. Kirkwood, appearing pro se (as he does on appeal as well), responded that his is a non-infringing "fair use" of Infinity's broadcasts under 17 U.S.C. § 107, and that he is exempted from liability as a "carrier" under 17 U.S.C. § 111(a)(3). After both parties moved for summary judgment, they stipulated that the case be tried on a record consisting of their summary judgment submissions and other stipulated and submitted facts. *See Infinity Broadcasting Corp. v. Kirkwood,* 965 F.Supp. 553, 555 (S.D.N.Y. 1997). After considering this record, the district court in a thorough opinion granted judgment to Kirkwood on the basis of his fair use defense. *Id.* at 561. The court did not address the carrier defense. *Id.* We hold that Kirkwood's retransmission of the copyrighted broadcasts is not a fair use. We therefore reverse the judgment of the district court and remand for consideration of Kirkwood's carrier defense.

## I. Background

Dial–Up is a system designed by Kirkwood to enable his customers to listen to radio broadcasts originating in various cities throughout the United States. At the time of the trial the Dial–Up system allowed access to the 10 largest radio markets in the country, and Kirkwood plans to expand to more cities. In each city Kirkwood places a radio receiver connected to a phone line. The receiver, like a normal radio, receives broadcasts over the air. It then transmits them into the phone line so that a caller can listen to whatever station the receiver is tuned to. The receiver responds to commands entered via touch-tone phone so that a caller can tune the receiver to different stations. Dial–Up subscribers pay a fee in exchange for a list of the (unpublished) phone numbers connected to the receivers. Kirkwood exercises no control over the selection of stations by callers, though he has apparently developed (but not implemented) a version of the system that could block the retransmission of particular stations. Except for a potentially costly long-distance phone bill (from which Kirkwood derives no benefit), there is nothing to prevent a caller from listening to a particular station 24 hours a day, seven days a week. Dial–Up is marketed to radio stations, advertisers, talent scouts and others in the entertainment and advertising industry for purposes such as "auditioning on-air talent, verifying the broadcast of commercials, and listening to a station's programming format and feel." Infinity, 965 F.Supp. at 555. It is also, as Kirkwood emphasizes, marketed to performance rights organizations to assist them in enforcing the copyrights of their member artists.

---

* Hon. Joanna Seybert, United States District Judge for the Eastern District of New York, sitting by designation.

Infinity owns a large network of radio stations, including stations in each of the markets in which Dial–Up has a receiver. Some of the programs that originate on Infinity-owned stations are syndicated, meaning that they are broadcast on stations in other markets in exchange for a fee or for advertising time. Some, but not all, of Infinity's stations have "listen lines," station-specific versions of Kirkwood's service that the stations offer for free to certain clients. On October 8, 1996 (after Infinity began this litigation) a Dial–Up subscriber, at Infinity's request, used Dial–Up to gain access to and record some or all of three radio programs broadcast on Infinity-owned stations. On October 18, Infinity registered these programs with the Copyright Office, and three days later served an amended complaint on Kirkwood adding claims for infringement of Infinity's copyrights in the three programs to its existing request for injunctive relief.

In June 1997, the district judge held that Kirkwood's actions were protected by the fair use defense set out in 17 U.S.C. § 107.[1] Applying the four factors enumerated in that statute, he decided that on balance they favored Kirkwood and that Kirkwood's use diminished neither the incentive of broadcasters to generate new creative programming, nor their "ability to gain a fair return on their endeavors." 965 F.Supp. at 560–61. This appeal followed.

## II. Discussion

### A. Burden of Proof and Standard of Review

■ According to the district court, it is "virtually undisputed" that Infinity has the exclusive right to perform its copyrighted programs and that Kirkwood's retransmissions infringe unless protected by either the fair use or carrier defense. 965 F.Supp. at 555. Since fair use is an affirmative defense to a claim of infringement, the burden of proof is on its proponent. *See Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 590, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994);

*American Geophysical Union v. Texaco, Inc.* 60 F.3d 913, 918 (2d Cir.1994) (party claiming fair use "typically carries the burden of proof as to all issues in the dispute").

■ "Fair use is a mixed question of law and fact. Where the district court has found facts sufficient to evaluate each of the statutory factors, an appellate court need not remand for further factfinding but may conclude as a matter of law that the challenged use does not qualify as a fair use of the copyrighted work." *Harper & Row v. Nation Enterprises*, 471 U.S. 539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (internal quotations and citations omitted). We therefore review the district court's fair use conclusion de novo, "though we accept its subsidiary findings of fact unless clearly erroneous." *Texaco*, 60 F.3d at 918.

### B. Analysis

■ Fair use is an "equitable rule of reason," which is to be applied in light of the statute. *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 448, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (quoting the House Report, H.R.Rep. No. 94–1476, pp. 65–66).

■ First, we look to the statutory preamble which lists, as being potentially fair uses, use "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research." 17 U.S.C. § 107. Although these categories "have an 'illustrative and not limitative' function, ... the illustrative nature of the categories should not be ignored." *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 78 (2d Cir.1997) (quoting *Campbell*, 510 U.S. at 577, 114 S.Ct. 1164). We note that Kirkwood's retransmissions fall into none of these illustrative categories.

■ Next, the statute instructs us to consider:

(1) the purpose and character of the use, including whether such use is of a commer-

---

1. 17 U.S.C. § 107 provides that:
 ... the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by [§§ 106 and 106A], for purposes such as

criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.

cial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107(1)-(4). These factors "are not meant to be exclusive." *Harper & Row*, 471 U.S. at 560, 105 S.Ct. 2218. "Nor may [they] be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578, 114 S.Ct. 1164. Since fair use "is a doctrine the application of which always depends on consideration of the precise facts at hand," *Texaco*, 60 F.3d at 916, we turn now to the application of the statutory factors to the facts of this case.

1. Purpose and Character of the Use

 The first statutory factor is the purpose and character of the alleged infringing use. The focus of this factor is

> whether the new work merely supersedes the objects of the original creation[,] or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is "transformative."

*Campbell*, 510 U.S. at 579, 114 S.Ct. 1164 (internal citations omitted). The district court found that this factor "cuts to some extent in Kirkwood's direction," primarily because Kirkwood "is using [Infinity's] broadcasts for a quite different purpose," namely for information rather than entertainment. 965 F.Supp. at 557. Kirkwood, too, argues at length about the differences between Infinity's purposes for its broadcasts and the reasons his customers use Dial–Up. We agree that the difference in purposes tends to support Kirkwood's fair use claim. However,

difference in purpose is not quite the same thing as transformation, and *Campbell* instructs that transformativeness is the critical inquiry under this factor.

 Although it "is not absolutely necessary" for a fair use to be transformative, "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579, 114 S.Ct. 1164. Here, as the district judge observed, "Kirkwood's retransmissions leave the character of the original broadcasts unchanged. There is neither new expression, new meaning nor new message." 965 F.Supp. at 557. In short, there is no transformation. As then-District Judge Leval noted in his frequently-cited article on fair use, a use of copyrighted material that "merely repackages or republishes the original" is unlikely to be deemed a fair use. Leval, Toward a Fair Use Standard, 103 Harv. L.Rev. 1105, 1111 (1990).

Kirkwood argues that Dial–Up's users transform the broadcasts by using them for their factual, not entertainment, content. However, it is Kirkwood's own retransmission of the broadcasts, not the acts of his end-users, that is at issue here and all Kirkwood does is sell access to unaltered radio broadcasts.[2] Also, it is not clear that all of Kirkwood's target audience "transforms" the broadcasts as he suggests. Talent scouts, who admittedly would not be listening in order to be entertained themselves, would nevertheless be listening for the entertainment value of the broadcasts rather than the factual content.

Kirkwood also argues that his service is "of substantial benefit to society" because, among other things, it enables advertisers to confirm that their commercials were properly aired. According to Infinity, however, 75 to 80 percent of the advertising on its stations is from companies within the station's broadcast range who may therefore monitor Infinity merely by turning on a radio. Similarly, the public benefit from other uses of Dial–Up

---

**2.** Citing *Texaco*, Kirkwood points out that he changes the format of the broadcasts so that they are available by telephone rather than radio. However, as we recognized in *Texaco*, 60 F.3d at

923, (and as Kirkwood admits in his brief on appeal) a change of format, though useful, is not technically a tranformation.

can either be accomplished by other methods or is simply not enough to justify Kirkwood's non-transformative retransmissions. *See Texaco*, 60 F.3d at 922 (finding no fair use even though photocopying to facilitate "research in the sciences ... might well serve a broader public purpose.").

■ We also note that the district court placed little or no emphasis on the commercial nature of Dial–Up. We agree that, notwithstanding its mention in the text of the statute, commerciality has only limited usefulness to a fair use inquiry; most secondary uses of copyrighted material, including nearly all of the uses listed in the statutory preamble, are commercial. As the Supreme Court observed in *Campbell*, to give commerciality a "presumptive force against a finding of fairness," would render the preamble a nullity. 510 U.S. at 584, 114 S.Ct. 1164. *See also, Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*, 150 F.3d 132, 141–42 (2d Cir.1998); *Texaco*, 60 F.3d at 921.[3]

In sum, we think the different, and possibly beneficial, purposes of Kirkwood's customers are outweighed by the total absence of transformativeness in Kirkwood's acts of retransmission. We find that the first statutory factor leans in Infinity's favor, rather than in Kirkwood's.

### 2. Nature of the Copyrighted Work

The second factor is the nature of the copyrighted work, which recognizes that creative works are "closer to the core of intended copyright protection" than more factual works. *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164. The district court found that this factor favored Infinity. 965 F.Supp. at 557. Kirkwood admits that some portions of the broadcasts are original and therefore deserving of copyright protection, but argues

that Infinity also broadcasts material such as music and advertisements to which it does not own the copyright. The district court properly recognized, however, that "the compilation of these and other elements to make the allegedly infringed works is both unique and creative." *Id.* The second factor favors Infinity.

### 3. Amount and Substantiality of the Portion Used

■ The third factor, amount and substantiality of the portion used, recognizes that the more of a copyrighted work that is taken, the less likely the use is to be fair, and that even a less substantial taking may be unfair if it captures the essence of the copyrighted work. *See e.g., Harper & Row*, 471 U.S. at 564–65, 105 S.Ct. 2218 (although "words actually quoted were an insubstantial portion" of copyrighted book, they were "essentially the heart of the book"). Though not an absolute rule, "generally, it may not constitute a fair use if the entire work is reproduced." Nimmer on Copyright, § 13.05[A][3] at 13–178 (1997). *See also, Weissmann v. Freeman*, 868 F.2d 1313, 1325 (2d Cir.1989).

It is somewhat difficult to apply this factor to Dial–Up. Depending on the interest of Kirkwood's customers, mere snippets of Infinity's broadcasts may be retransmitted or a single station may be listened to for hours at a time. According to the district court "[t]here is a virtually complete absence of proof concerning the extent to which the three copyrighted programs at issue were retransmitted by Kirkwood's service." 965 F.Supp. at 558. Since Kirkwood has the burden of proof on fair use, *Texaco*, 60 F.3d at 918, this seems to cut against Kirkwood. Moreover, like the district court, we are con-

---

**3.** In any event, even if commerciality retained its significance after *Campbell*, it would not help Kirkwood's case. The district court, seeking perhaps unnecessarily to play down the commercial nature of Kirkwood's use, quoted *Sony* and pointed out that Kirkwood merely enables his listeners "to hear broadcasts which [they] had been invited to witness in [their] entirety free of charge." 965 F.Supp. at 556. However, the *Sony* court made that observation in the context of determining that time-shifting of television

programs by consumers in their homes was a non-commercial use, so its applicability to Kirkwood's admittedly commercial service is doubtful. *See Campbell*, 510 U.S. at 591, 114 S.Ct. 1164. More important, *Sony* is further distinguishable on the grounds that, while Sony manufactured Betamax machines, it did no copying of copyrighted material itself. 464 U.S. at 436–37, 104 S.Ct. 774. Here, Kirkwood himself performs the allegedly infringing acts of retransmission.

vinced that in this case the *potential* scope of retransmission is more relevant than evidence of actual retransmission by Dial–Up users thus far. Dial–Up permits essentially unlimited access to radio broadcasts in the cities in which it has receivers and there is thus the potential for retransmission of entire copyrighted programs. As the district court observed,

> [t]he more successful Kirkwood becomes in selling his service to interested parties, the more likely it is that any given broadcast will be retransmitted ... [and] that a subscriber, or the collective action of a plurality of subscribers, will cause Kirkwood to retransmit most or all of a given program.

965 F.Supp. at 558. Again, Kirkwood argues that because his users' motives are beneficial to the purpose of copyright it makes no difference if entire broadcasts are heard (see discussion in section B. 1, above). As there discussed, however, societal benefit does not guarantee a finding of fair use. Nor does it, by itself, answer the question most relevant to this factor: whether "no more was taken than necessary." Campbell, 510 U.S. at 589, 114 S.Ct. 1164. Even if Kirkwood is correct that society benefits from his provision of access to Infinity's broadcasts, he still must justify potentially providing his subscribers with access to every radio station in the cities Kirkwood serves, 24 hours a day, seven days a week. We agree with the district court that the third factor favors Infinity.

4. Effect of the Use upon the Potential Market

▮▮▮▮ The fourth factor, effect of the use on the potential market for the copyrighted work,

> requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also "whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market" for the original.

Campbell, 510 U.S. at 590, 114 S.Ct. 1164 (quoting Nimmer, § 13.05[A][4], at 13–102.61). Not all harms are cognizable under this factor. Specifically, fair use does not condemn the suppression or even destruction of the market by, for example, a "scathing theater review" or a parody. *See Campbell*, 510 U.S. at 591–92, 114 S.Ct. 1164. Rather, it is concerned with secondary uses that, by offering a substitute for the original, usurp a market that properly belongs to the copyright-holder. As always, Kirkwood bears the burden of showing that his use does not cause this type of harm to Infinity's interests, including Infinity's own listen lines. But cf., *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 116 n. 6 (2d Cir.1998) (In case where plaintiff conceded lack of market for derivative works, "defendant had no obligation to present evidence showing lack of harm").

Historically, the fourth factor has been seen as central to fair use analysis, *Harper & Row*, 471 U.S. at 566, 105 S.Ct. 2218 ("This last factor is undoubtedly the single most important element of fair use."), although the Supreme Court appears to have backed away from this position. *See Texaco*, 60 F.3d at 926 (observing that the Supreme Court in *Campbell* omitted mention of the fourth factor's primacy and instructed that all factors are to be explored); *Castle Rock*, 150 F.3d at 145–46 ("Supreme Court has recently retreated ..." from suggestion that fourth factor is most important); *Leibovitz*, 137 F.3d at 113. But see *Princeton University Press v. Michigan Document Svcs.*, 99 F.3d 1381, 1385 (6th Cir.1996) (in banc) (acknowledging Second Circuit's observation but calling fourth factor first among equals). See generally, Leval, 103 Harv. L.Rev. at 1124 (Supreme Court has "somewhat overstated" importance of fourth factor; fact that secondary use does not harm the market "gives no assurance" that secondary use is justified). The district court stated that it would have reached the same result regardless of the comparative importance of the fourth factor, 965 F.Supp. at 559 n. 21, and so would we.

The district court, in applying this factor, started from the assumption that the value of Infinity's copyrighted programs "lies in the ability to attract listeners" by providing the programs to the general public either on its own stations or, by syndication, on stations owned by others. *Id.* at 559. The court then

concluded that Kirkwood's service, which is "directed to a narrow and specialized audience," was likely to have no material effect on the value of the copyrighted material. *Id.* at 560. The district court regarded as particularly relevant that Infinity is neither in the business of operating commercial listen lines nor has it "attempted to license the retransmission of its copyrighted programming for purposes such as Kirkwood's," and that the potential revenues to be obtained from such licensing, based on Kirkwood's experience, are "extremely modest." *Id.*

We are not as impressed by these facts as was the district court. Although Infinity does not operate commercial listen lines such as Kirkwood's, certain of its stations have their own listen lines and Infinity described these lines as being included in a "package" offered to certain advertisers. It is true that Infinity does not charge separately for these lines, and that Kirkwood has had limited success in doing so himself. But this does not necessarily mean that Infinity derives no economic benefit from its listen lines or that Kirkwood's use has only a negligible effect on Infinity's potential to exploit this market. Infinity, in the exercise of its business judgment, has decided that its best current use of listen lines is to offer them at no additional cost to certain "valued customers." Dial–Up disrupts this practice by removing Infinity's control over who should have access to such lines. Kirkwood is selling Infinity's copyrighted material in a market that Infinity, as the copyright owner, is exclusively entitled to exploit. Kirkwood does not suppress demand for Infinity's broadcasts in the manner of a reviewer, but instead *replaces* Infinity as the supplier of those broadcasts to meet the demand of his customers. This is precisely the kind of harm the fourth factor aims to prevent. As Infinity points out in its brief on appeal, "the revenues that Kirkwood generates for himself come not from a market that is only 'likely to be developed,' *Texaco*, 60 F.3d at 930, but from a market that Infinity currently occupies," albeit in different form. Infinity's presence in Kirkwood's market weighs in Infinity's favor on this factor.

Kirkwood also implies that Infinity lacks an incentive to exploit the listen line market because enabling advertisers to check up on Infinity's advertising billing practices is against its interest. This is not obvious, as evidenced by the fact that Infinity *does* offer listen lines to some advertisers. If we assume that advertisers will prefer to use broadcasters that can be relied upon to be honest, and consider the provision of monitoring services like listen lines to be an indicator of such reliability, then broadcasters who do *not* offer listen lines may be at a competitive disadvantage.

Also, the possible unavailability of a substitute for Kirkwood's service is something that may be considered in determining the remedy, if any, to which Infinity may be entitled. The Supreme Court suggested in *Campbell* that injunctive relief may be withheld where there is "a strong public interest in the publication of the secondary work [and] the copyright owner may be adequately protected by an award of damages." 510 U.S. at 578 n. 10, 114 S.Ct. 1164 (*quoting Leval*, 103 Harv. L.Rev. at 1132). We express no opinion as to the appropriate remedy in this case if Kirkwood is finally adjudged an infringer.

On balance, we think the fourth factor is a very close question. Infinity admits that it has no present interest in operating separate for-profit listen lines, but has demonstrated at least the potential for interference with its inclusion of listen lines as part of its advertising package. We disagree with the district court that this factor "strongly favors" Kirkwood, 965 F.Supp. at 560, and indeed, considering that Kirkwood bears the burden of showing an absence of "usurpation" harm to Infinity, believe that it tips toward Infinity.

### 5. Aggregate Assessment

By our calculation, all four statutory factors point toward infringement and the lack of fair use. The statutory factors are not exclusive, *Harper & Row*, 471 U.S. at 560, 105 S.Ct. 2218, but the facts of this case do not suggest any significant factors we have not already considered, and our assessment of the case in more abstract terms only strengthens our conclusion that Kirkwood's is not a fair use. Kirkwood creates nothing and advances no body of knowledge or criticism. He simply takes Infinity's unaltered

broadcasts and markets them to a specific clientele. *See, Pacific and Southern Co., Inc. v. Duncan,* 744 F.2d 1490 (11th Cir.1984) (off-the-air videotaping of news broadcasts for sale to subjects of the stories not fair use).

Kirkwood has not met his burden of showing that his use of Infinity's broadcasts does not infringe Infinity's copyrights. Kirkwood likens Dial–Up to a library photocopy machine, invoked by customers whose particular use may or may not be infringing. However, as Infinity points out, large-scale photocopying, even for the statutorily-approved purpose of educational use, can still infringe. *See e.g., Princeton,* 99 F.3d at 1389 (courts have rejected attempts by for-profit users to stand in the shoes of their customers); *Basic Books, Inc. v. Kinko's Graphics Corp.,* 758 F.Supp. 1522, 1526 (S.D.N.Y.1991). *See also Texaco,* 60 F.3d at 931 (photocopying entire articles for personal archival use not a fair use). Given the potential for large-scale retransmission of Infinity's broadcasts by Kirkwood's service, we conclude that Dial–Up's retransmission of Infinity's copyrighted broadcasts is not a fair use.

### C. Conclusion

Our holding that Kirkwood's is not a fair use does not necessarily end the case because Kirkwood has also asserted the defense that he is a "carrier" and thus is statutorily exempted from liability. See 17 U.S.C. § 111(a)(3). The district court, because it found Kirkwood's fair use defense meritorious, did not address the carrier defense. 965 F.Supp. at 561.

As part of its argument that the fair use defense does not apply, Infinity says that the existence of an exemption from infringement liability for statutory carriers implies that Congress foresaw retransmission and specified when it would and would not constitute infringement. By this argument, if Kirkwood is not a carrier (as Infinity argues he is not), then his retransmission could not be a fair use. If we had decided that Dial–Up constituted a fair use, this argument would acquire more importance since we would want to satisfy ourselves that Congress did not intend that all retransmissions not cov-

ered by the carrier provisions be deemed infringements (an issue on which we take no position). However, since we decide that Dial–Up is not a fair use, we need not bolster that conclusion by addressing Infinity's fair use argument based on the carrier provisions. As for the carrier defense itself, we think it is sound judicial administration to leave this issue to the district court to decide in the first instance and we, of course, express no opinion as to the merits of that defense.

The judgment of the district court is reversed and the case is remanded for further proceedings in accordance with this opinion.