Kaplan, District Judge,* concurring:
I concur in the result as well as part I, the preamble to part II, and parts II.B, III and IV of the majority opinion. With great respect for my learned and distinguished colleagues, however, I do not join in their characterization of TVEyes' Watch function as "somewhat transformative." I decline for two reasons.
First, although the majority writes that it "is at least somewhat transformative," it holds that the Watch function nevertheless is not a fair use of Fox's copyrighted material. Stated differently, it holds that the other factors relevant to the fair use determination carry the day in favor of Fox regardless of whether the Watch function is or is not transformative. The "somewhat transformative" characterization therefore is entirely immaterial to the resolution of this case-in a familiar phrase, it is obitur dictum .[1] I would avoid any such characterization even if I agreed with it.
Second, while I prefer not to state a view as to whether the Watch function is transformative, I would be remiss, given the majority's opinion, if I did not express my doubt that the majority's view is correct. To the contrary, were we compelled to reach the point, I would be inclined to conclude that it is not.
I
I do not suggest that this or any appellate court should "purge dictum from [its] opinions."[2] But there are situations in which sound prudential reasons counsel against making statements that are "superfluous to the court's performance of its function."[3] I submit that this is one of them.
*183 1. "[T]he goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. Such works thus lie at the heart of the fair use doctrine[ ]."[4] "[T]he more transformative the new work, the less will be the significance of other factors."[5] It therefore is not at all surprising that attempts by alleged infringers to characterize their uses of copyrighted works as "transformative" have become a key battleground in copyright litigation, particularly as technological advances provide ever-new contexts in which the uncompensated use of copyrighted works is very attractive. And the law governing such controversies often is far from clear. As noted commentators have observed, courts "appear to label a use 'not transformative' as a shorthand for 'not fair,' and correlatively 'transformative' for 'fair.' Such a strategy empties the term of meaning."[6] Indeed, as will appear, some of our own decisions on the issue are at least in tension with one another.[7]
In these circumstances, a finding of transformative use, while "not absolutely necessary for a finding of fair use,"[8] is "of crucial importance to the fair use analysis."[9] And as the issue of fair use, in the words of a distinguished panel of this Court that remain apt despite intervening years, is "the most troublesome in the whole law of copyright," it is one that "ought not to be resolved in cases where it may turn out to be moot, unless the advantage is very plain."[10] The majority's unnecessary characterization of the Watch function as "somewhat transformative" has no "advantage," let alone one that is "very plain." Indeed, I fear it may contribute to confusion and uncertainty regarding this central concept in the law of fair use. Moreover, it threatens to do so in circumstances in which there is no realistic possibility of further appellate review.[11] The determination of the transformative use issue should be left for a case in which the question necessarily is presented.
2. The advisability of expressing a view as to whether the Watch function is "transformative" is diminished further because this case passes judgment on a technological innovation. New efficiency-enhancing content delivery technologies that will seek to distribute copyrighted material owned by others doubtless now or soon will exist. Indeed, the efficiency enhancement that the Watch function allegedly provides appears to be, or to have become at least partly, available from Internet-based television subscription services to which Fox News presumably licenses its content.[12]
*184 Given (a) the rapid pace of technological change, (b) the importance of the concept of transformative purpose in fair use jurisprudence, and (c) the fact that it is unnecessary to address the question in this case, I respectfully disagree with the majority's decision to express a view as to whether the Watch function is transformative.
II
In view of the majority's expression of its opinion that the Watch function is "somewhat transformative," I feel compelled to express my own doubts regarding that conclusion.
1. The majority's opinion begins its analysis by observing, correctly in my view, that "[i]t is useful to analyze separately distinct functions of the secondary use (i.e., the use by TVEyes of Tox's copyrighted material), considering whether each independent function is a fair use."[13] It then turns to the distinction between the Search function and the Watch function. The Search function "allows clients to identify videos that contain keywords of interest"[14] -it "enables users to isolate, from an ocean of programming, material that is responsive to their interests."[15] The Watch function, in contrast, "allows TVEyes clients to view up to ten-minute, unaltered video clips of copyrighted content."[16] In short, the Search function, which is not challenged here, is simply a vehicle that locates Fox's copyrighted works among other works of interest-it finds the desired species of fish in the majority's metaphorical sea. But the Watch function then catches those fish and delivers them to the fishmonger's stall where TVEyes lays them unchanged (one might say untransformed) on cracked ice for the inspection of its patrons.
Metaphor aside, the majority then proceeds to test the Watch function, ''consider[ing] each of the four [fair use] factors."[17] It describes our decision in Google Books ,[18] noting that we there "held that the 'snippet view' of unaltered, copyrighted text 'add[ed] important value to the basic transformative search function' by allowing users to verify that the list of books returned by the database was responsive to the user's search."[19] And it then goes on to say:
*185 "TVEyes's copying of Fox's content for use in the Watch function is similarly transformative insofar as it enables users to isolate, from an ocean of programming, material that is responsive to their interests and needs, and to access that material with targeted precision. It enables nearly instant access to a subset of material-and to information about the material-that would otherwise be irretrievable, or else retrievable only through prohibitively inconvenient or inefficient means."[20]
But, as the majority itself wrote earlier, it is the Search function that enables users to identify the desired fish in the ocean, not the Watch function. What the Watch function does is to enable instant access to digital recordings of Fox's content that have been identified by the Search function. And the majority's justification for concluding that the Watch function is "somewhat transformative" is that it "improvers] the efficiency of delivering content."[21]
2. I am inclined to reject the idea that enhancing the efficiency with which copies of copyrighted material are delivered to secondary issuers, in the context in which the Watch function does so, is transformative.
The concept of transformation is a relatively recent addition to copyright jurisprudence, but its antecedents have been around for a long time.
In 1841, Justice Story said that "no one can doubt that a reviewer may fairly cite largely from the original work, if his design be really and truly to use the passages for the purposes of fair and reasonable criticism," but use that "supersede[s] the original work" is not fair.[22] Building on that idea, Judge Leval's landmark article, which later was adopted substantially by the Supreme Court in the Pretty Woman case,[23] said:
"I believe the answer to the question of justification turns primarily on whether, and to what extent, the challenged use is transformative. The use must be productive and must employ the quoted matter in a different manner or for a different purpose from the original. A quotation of copyrighted material that merely repackages or republishes the original is unlikely to pass the test; in Justice Story's words, it would merely 'supersede the objects' of the original. If on the other hand, the secondary use adds value to the original-if the quoted matters is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings-this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society.
Transformative uses may include criticizing the quoted work, exposing the character of the original author, proving a fact, or summarizing an idea argued in the original in order to defend or rebut it. They may also include parody, symbolism, aesthetic declarations, and innumerable other uses."[24]
Even on the majority's view that TVEyes' Watch function substantially improves the efficiency with which TVEyes customers can access Fox copyrighted broadcasts of possible interest, it does no more than repackage and deliver the original *186 works. It adds no new information, no new aesthetics, and no new insights or understandings. I therefore doubt that it is transformative. Indeed, I regard Infinity Broadcast Corp. v. Kirkwood as having settled the question whether a use is transformative simply because it is more efficient or convenient than what preceded it.[25]
In that case, the defendant, Kirkwood, offered a service through which a Kirkwood customer, regardless of its physical location, could dial a Kirkwood device over a phone line, tune to the radio station of its choice in any of the nation's 10 largest radio markets, and listen to the broadcast of its chosen station. Kirkwood marketed the service to "radio stations, advertisers, talent scouts, and others" for purposes such as "auditioning on-air talent, verifying the broadcast of commercials, and listing to a station's programming format and feel."[26] No doubt Kirkwood's service was convenient and efficiency-enhancing. It enabled interested clients who, by reason of distance, could not receive the radio stations of interest to them to (a) access those stations through Kirkwood, (b) listen to their broadcasts over telephone lines and (c) do so for reasons that, at least in many cases, had nothing to do with the purposes for which local listeners tuned their radios to their stations of choice. Nevertheless, this Court rejected Kirkwood's fair use defense, stating that there was a "total absence of transformativeness" in Kirkwood's retransmission of the broadcasts.[27] And the Watch function at issue here is essentially indistinguishable in principle.
We rejected the argument that convenience of accessing copyrighted material is a transformative purpose in American Geophysical Union, el al. v. Texaco[28] as well. That involved photocopying of scientific journal articles for use in laboratories. Texaco there argued that "its conversion of the individual [journal] articles through photocopying into a form more easily used in a laboratory might constitute transformative use."[29] Notwithstanding the fact that the photocopies often were more convenient or efficient than, for example, buying, borrowing, shelving and carrying about bound volumes of journals, we wrote that "Texaco's photocopying merely transforms the material object embodying the intangible article that is the copyrighted original work. Texaco's making of copies cannot properly be regarded as a transformative use of the copyrighted material."[30]
Also closely aligned with this case are others that dealt with technologies relating to digitized music, mp3s, and music sharing. Defendants in those cases argued that their technologies should be considered fair use because they permitted "space-shifting"-they allowed users to store music in different, more convenient forms that allowed them to listen to it in venues more desirable to them.[31] In other words, the technology enhanced efficiency and convenience. But courts presented with this argument either rejected the idea that space-shifting is a transformative purpose or considered the space-shifting argument *187 relevant only to the question of the commercial nature of the use.[32]
These cases support my inclination to conclude that a technological means that delivers copies of copyrighted material to a secondary user more quickly, efficiently or conveniently does not render the distribution of those copies transformative, at least standing alone.
Nor does Google Books support the conclusion that efficiency-enhancing delivery technology is transformative in the circumstances of this case. Google Books, like this case, involved two features: a searchable database and the display of "snippets" from the books containing the search term.[33] We held that copying the books to enable the search function had the transformative purpose of "identifying books of interest to the searcher." That purpose was different than the purpose of the books themselves, which served to convey their content to the reader, and it constituted fair use.[34] We held also that the snippets-"horizontal segment[s] comprising ordinarily an eighth of a page"-"add[ed] importantly to the highly transformative purpose of identifying books of interest to the searcher."[35] But Google Books does not resolve this case.
Google designed the snippet feature "in a manner that substantially protects against its serving as an effectively competing substitute for Plaintiffs' books," employing safeguards such as "blacklisting" (making permanently unavailable for snippet view one snippet per page and one complete page out of every ten) and showing no snippets at all from the sorts of books for which a short snippet would represent all the content a searcher wanted to see (such as dictionaries and cookbooks).[36] Here, on the other hand, the Watch function shows ten minute clips, and parties can play unlimited numbers of ten minute clips. Certainly a ten minute clip in many, perhaps most, situations suffices for a user to view an entire news segment. And in situations in which that is not the case, the parties dispute the effectiveness of a preventive measure TVEyes introduced during the course of this litigation to stop users from watching consecutive clips.[37] Given the posture of this case-review of a summary judgment decision adverse to Fox on this point-we must view the facts presented by Fox as true and therefore base our decision on the premise that users may access all of Fox's content by stringing clips together.[38]
*188 The facts here thus differ from Google Books quite substantially. The snippet function considered there delivered much less copyrighted content than the Watch function at issue here. Nevertheless, we there concluded that the snippet function only "adds" to the transformative purpose of the Search function. Our conclusion with respect to the Google Books snippet feature therefore does not control the proper characterization of the Watch function at issue here. Moreover, we cautioned in Google Books that the case "test[ed] the boundaries of fair use."[39]
3. Nor am Ipersuaded by the majority's reliance on Sony Corporation of America v. Universal City Studios, Inc .[40]
Sony considered a claim that the manufacturer of Betamax video recorders was liable for contributory copyright infringement because its sale of the recorders facilitated copyright infringement by consumers by virtue of the consumers' recording of copyrighted broadcasts to enable them to view the programs at times more convenient to them.[41] The Court rejected the contributory infringement claim, essentially on the bases that (a) substantial numbers of copyright holders would not object to the consumers' use of the Sony equipment for "time shifting," and (b) the plaintiffs had failed to prove any likelihood of consequent economic harm.[42]
The majority here reads Sony as reasoning "that a secondary use may be a fair use if it utilizes transformative technology to improve the efficiency of delivering content."[43] But Sony was decided before Judge Leval's article introduced the concept of transformative use or purpose into the copyright lexicon.[44] I thus find what Sony teaches about transformative purpose, if anything, to be less than perfectly clear. I certainly do not find within Sony the idea that efficiency-enhancing technology is transformative.
The efficiency enhancement at issue in Sony was "time-shifting"-the use by a consumer of a Betamax device to record a broadcast so that the consumer could watch that show at a later, presumably more convenient, time.[45] The Court asked whether time-shifting was a substantial noninfringing use; the answer to that question determined whether Sony could be liable for contributory infringement.[46] It was in that context that the Court found that unauthorized time shifting-consumers recording copyrighted shows without authorization to watch the shows once at a *189 later time-was "not necessarily infringing."[47]
The Court's discussion of time-shifting focused on the non-commercial nature of in-home recording: "[R]espondents failed to demonstrate that time-shifting would cause any likelihood of nonminimal harm to the potential market for, or the value of, their copyrighted works. The Betamax is, therefore, capable of substantial noninfringing uses. Sony's sale of such equipment to the general public does not constitute contributory infringement of respondent's copyrights."[48]
Perhaps the Court in Sony would have found efficiency-enhancing technology to be transformative for that reason alone had that argument been put to it. But I see no indication of that in the opinion. Rather, Sony turned on the question whether "time-shifting," on the facts presented in that case, was a commercial use that affected the broadcasters' ability to make a profit in the market. And the Court so concluded without considering, at least explicitly, whether the recordings served a purpose different from the original broadcasts. In fact, the Court said that "timeshifting merely enables a viewer to see such a work which he had been invited to witness."[49] In other words, time-shifting allows a user to do exactly that which the user could have done with the original: watch the show for whatever entertainment, informational or other purpose it serves. No new purpose had been added. So I hesitate to conclude that Sony mandates, or even suggests, the idea that efficiency-enhancing technology is transformative.
My hesitation in this regard is strengthened by this Court's subsequent treatment of Sony. No prior opinion of this Court says, or even suggests, that Sony stands for the proposition that time-shifting in particular, or efficiency-enhancing delivery technology in general, is transformative. In Swatch Group Management Services Ltd v. Bloomberg L.P., we described Sony as a decision "finding a non-transformative use to be a fair use."[50] Infinity Broadcast Corp. described Sony's discussion of time-shifting as a "determination] that time-shifting of television programs by consumers in their homes was a non-commercial use."[51] Indeed, as noted, we there held that an efficiency promoting technology was not transformative and gave no sign that Sony was relevant to that conclusion.
Similarly, Authors Guild, Inc. v. HathiTrust[52] and Google Books[53] cite Sony for various principles, but never for the proposition that efficiency-enhancing technology is transformative, despite that idea's obvious potential application in those cases. Because HathiTrust and Google Books so clearly confront an issue closely related to that here, I see as instructive their omission of the idea that Sony declared efficiency-enhancing delivery technology to be transformative. I would join those cases in declining to construe Sony as offering significant guidance regarding transformative use.
In sum, Sony's relevance to transformative use is, at best, unclear. I decline to *190 join in the majority's novel interpretation of Sony.
III
For the foregoing reasons, I concur in the judgment of this Court and in part I, the preamble to part II, and parts II.B, III and IV of the majority opinion. I decline to join in part II.A and its characterization of the Watch function as "somewhat transformative."

Lewis A. Kaplan, United States District Judge for the Southern District of New York, sitting by designation.

Contrary to the majority's suggestion, we are not obliged to reach a definitive decision as to each of the fair use factors in order to decide the fair use issue. Henley v. Devore, 733 F.Supp.2d 1144, 1155 (C.D. Cal. 2010) (assuming but not deciding that secondary use was transformative, but nevertheless rejecting fair use defense).

Pierre N. Leval Judging Under the Constitution: Dicta About Dicta, 81 N.Y.U. L. Rev. 1249, 1282 (2006) (hereinafter "Dicta" ).

Id. at 1257.

Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 579, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994).

Id.

4 Melville B. Nimmer and David Nimmer, Nimmer on Copyright § 13.05, at 13-169 (2017).

See id. at 13-170.

Id. at 13-166.

Id. at 13-166 to 167.

Dellar v. Samuel Goldwyn, Inc., 104 F.2d 661, 662 (2d Cir. 1939) (per curiam) (L. Hand, A. Hand, Patterson, JJ).

Dicta, 81 N.Y.U. L. Rev. at 1262.

I understand that Internet-based cable subscription services now available allow a subscriber to record cable shows, store (some with limits on the amount that can be stored, some without), and re-watch those shows within a certain time frame (for example, within nine months of the recording). See Eric Liston, How to Watch Fox News Without Cable-Your Top 5 Options, Flixed (Dec. 6, 2017), https://flixed.io/watch-fox-news-without-cable/. Someone who wanted to "monitor" Fox News could DVR (i.e., direct video record) all Fox News shows using these paid services. Upon using TVEyes's Search function-the transformative nature of which was not challenged-to identify when a term was said in a broadcast, the user could click directly to that portion of the broadcast and watch it immediately online using their paid subscription service. It is unclear whether these services as they currently exist would allow a user to monitor all local broadcasts throughout the country, but they certainly diminish the Watch function's convenience value.
And technology will march on, perhaps soon eliminating altogether the efficiency the majority claims renders the Watch function transformative.
I recognize, of course, that there appears to be no discussion of these services in the record. This is at least partially attributable to the fact that the advent of some of these services post-dates this litigation. But this demonstrates handily the point that technology is rapidly evolving, which is all the more reason to decline to pronounce a piece of technology transformative when it is not necessary to do so.

Op. at 176. See also Craft v. Kobler, 667 F.Supp. 120, 128 (S.D.N.Y. 1987) (Leval, J.) ("In assessing claims of fair use, we must consider the number, size and importance of appropriated passages, as well as their individual justifications." (emphasis added) ); 4 William N. Patry, Patry on Copyright § 10.13, at 10-47 to 10-49 (2012).

Op. at 176 (emphasis in original).

Id. at 177.

Id. at 176 (emphasis in original).

Id.

Authors Guild v. Google, Inc., 804 F.3d 202 (2d Cir. 2015) (hereinafter "Google Books" ).

Op. at 177.

Id. (emphasis added).

Id.

Folsom v. Marsh, 9 F. Cas. 342, 344 (No. 4,901).

Campbell, 510 U.S. at 578-79, 114 S.Ct. 1164.

Pierre N. Leval, Toward a Standard of Fair Use, 103 Harv. L. Rev . 1105, 1111 (1990).

150 F.3d 104 (2d Cir. 1998).

Id. at 106 (internal quotation marks omitted).

Id. at 109.

60 F.3d 913 (2d Cir. 1994).

Id.

Id. at 923 (citations omitted).

See A&M Records, Inc. v. Napster, Inc. 239 F.3d 1004, 1019 (9th Cir. 2001), as amended (Apr. 3, 2001), aff'd sub nom. A&M Records, Inc. v. Napster, Inc., 284 F.3d 1091 (9th Cir. 2002).

See A&M Records, Inc., 239 F.3d at 1019 (cases holding space-shifting or time-shifting to be fair use inapposite "because the methods of shifting in [those] cases did not also simultaneously involve distribution of the copyrighted material to the general public"); Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc., 180 F.3d 1072, 1079 (9th Cir. 1999) ("The [device at issue] merely makes copies in order to render portable, or 'space-shift,' those files that already reside on a user's hard drive. Such copying is paradigmatic noncommercial personal use entirely consistent with the purposes of the Act." (citation omitted) ); UMGRecordings, Inc. v. MP3.Com, Inc., 92 F.Supp.2d 349, 351 (S.D.N.Y. 2000) (considering the argument that space-shifting is transformative to be "simply another way of saying that the unauthorized copies are being retransmitted in another medium-an insufficient basis for any legitimate claim of transformation").

804 F.3d at 206.

Id. at 217-18.

Id.case-ids="4357808" index="114" url="https://cite.case.law/f3d/804/202/"> at 209, 218.

Id. at 222-23.

Op. at 8.

Fair use is an affirmative defense to Fox's infringement claim and thus a matter as to which TVEyes bears the burden of proof. Accordingly, in resisting a determination that TVEyes is entitled to judgment on the basis of fair use, Fox is entitled to the view of the evidence most favorable to it with respect TVEyes' contention that the Watch function is transformative, as it is on all other aspects of that defense. FDIC v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994) ("whatever evidence there is to support an essential element of an affirmative defense will be construed in a light most favorable to the non-moving defendant") (emphasis in original); Frankel v. ICD Holdings, S.A., 930 F.Supp. 54, 64-65 (S.D.N.Y. 1996) ("one who relies upon an affirmative defense to defeat an otherwise meritorious motion for summary judgment must adduce evidence which, viewed in the light most favorable to and drawing all reasonable inferences in favor of the non-moving party, would permit judgment for the non-moving party on the basis of that defense").

Google Books , 804 F.3d at 206.

464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984).

Id. at 419, 104 S.Ct. 774.

Id. at 456, 104 S.Ct. 774.

Op. at 12.

Id .

Sony, 464 U.S. at 423, 104 S.Ct. 774.

Id. at 442, 104 S.Ct. 774.

Id.case-ids="6200302" index="130" url="https://cite.case.law/us/464/417/"> at 447, 104 S.Ct. 774.

Id. at 455, 104 S.Ct. 774.

Id. at 449, 104 S.Ct. 774.

756 F.3d 73, 84 (2d Cir. 2014) (emphasis added).

150 F.3d at 109 n.3.

755 F.3d 87 (2d Cir. 2014).

804 F.3d at 202.